OPINION OF THE COURT
Alexander Berman, J.
I have before me yet another instance of what legal chroniclers of the future will no doubt refer to in their footnotes as the "pica polemic.” In proceedings too numerous to set forth, Judges, lawyers and a battery of printing experts have spent untold hours discussing, debating and arguing, not as one might expect about the meaning of words, but rather their height. The letters such as "o”, "t” and "y” have been measured with a wide variety of instruments. Terms such as "font”, "slug”, and "point” have replaced the customary legal argot. The cause of this sudden concern with typography— section 576 (subd 1, par [c]) of the Banking Law and subdivision 1 of section 313 of the Vehicle and Traffic Law, and their requirement that an insured whose policy of insurance is being canceled must be given notice that failure to maintain financial security on his vehicle will result in a revocation of its registration in "type of which the face shall not be smaller that twelve point” (Vehicle and Traffic Law, § 313) and "type or print of which its face shall not be smaller than twelve point” (Banking Law, § 576, subd 1, par [c]). The cases decided in the trial courts can be placed in two categories. The first, *807 wherein it is held a literal compliance with the sections, requires that the letters making up the notice must be physically measured to determine if they measure 12 points (see, e.g., Nassau Ins. Co. v Lion Ins. Co., 89 Misc 2d 982; Lion Ins. Co. v Walowitz, 93 Misc 2d 483; State Farm Ins. Co. v Carrabis, Supreme Ct, Suffolk County, Dec. 20, 1977 [Thom, J.]; Lion Ins. Co. v McNeely Co., Supreme Ct, Nassau County, March 21, 1978 [Levitt, J.]). The others are those cases which hold that despite the fact that the words do not physically measure 12 points, the intent of the Legislature was to provide that reasonable notice be given, and the notices were calculated to effect that purpose. (Aetna Cas. Co. v Al-Amay, Supreme Ct, New York County, March 4, 1978 [Sutton, J.]; Everready Ins. Co. v Padilla, NYLJ, Jan. 25, 1978, p 11, col 6.) Implicit in these determinations is a requirement that the "face” of the type used, or the printed impression made, must be measured. In my opinion, all of these decisions have been based on the assumption that the Legislature was fully aware of what it was saying when it enacted the print requirements of the sections involved. Here, that premise has been seriously challenged.
The underlying facts giving rise to this proceeding, conform to what has now become a classic pattern.
On July 12, 1976, a vehicle being driven by respondent, Donald F. Hammer, and insured by petitioner, Travelers Indemnity Company, was in a collision with a vehicle driven by one Bruce Shilstone. Counsel for Hammer, upon inquiry to respondent, Commercial Union Assurance Companies, the carrier thought to be the insurer of the Shilstone vehicle, was informed that the policy of insurance issued to Shilstone had been canceled for nonpayment of premiums as of January 20, 1976, some six months prior to the accident. Upon being advised of this, Hammer filed a claim with petitioner under the "uninsured motorists” provision of his policy with Travelers. A demand for arbitration prompted a petition pursuant to CPLR 7503, for a stay on the grounds that the offending vehicle was not, in fact, "uninsured.” A temporary stay was granted pending the trial of the preliminary issue of the validity of Commercial Union’s disclaimer. The trial of that issue was held before me.
These facts have been established. In October, 1975, respondent, Commercial Union, issued an automobile liability policy to Bruce Shilstone. The policy was placed with it pursuant to *808 the "assigned risk plan” by American Brokerage Service Corporation. The premium was financed by Kings Premium Service Corporation (a premium finance company within the meaning of Banking Law, art 12-B), pursuant to an agreement entered into between it and Shilstone on October 2, 1975. Under the terms of their agreement, Kings was authorized to cancel the policy in the event of a default in payment. Such a default occurred in December of 1975. A notice of cancellation was mailed by Kings on January 6, 1976, effective January 20, 1976. Commercial Union was given notice of the cancellation and subsequently refunded the unearned premium to Kings.
Since the cancellation was made pursuant to article 12-B of the Banking Law, compliance with the provisions of section 576 of the Banking Law must have been complied with in order that there be a valid cancellation. Petitioner contends that respondents did not comply. Respondents contend they did. With the exception of compliance with statutory print size of section 576 (subd 1, par [c]) of the Banking Law, the claimed defects with respect to notice, mailing, etc., are without merit, and I find that they were complied with. The balance of this opinion will deal exclusively with the claims of the parties with respect to the size of the print.
Before setting forth the reasons for my determination in this matter, I will briefly attempt to describe what is involved from a layman’s point of view. As previously noted, section 576 of the Banking Law requires that the notice as to "financial security” be "in type or print of which the face shall not be smaller than twelve point.” Since it is the interplay of the underlined terms that is of prime significance, they should be defined. "Type” is a rectangular prism of metal, a standard 0.918 inches in height (lower to upper end), bearing on the upper end a raised letter, figure or character in reverse, which when inked will make an impression on paper or other material. The solid itself is referred to as the body or shank. The "Face” is the raised portion of the upper end of the type used to make the impression; the space on the upper end unoccupied by the face is referred to as the shoulder. The term "12 point” has reference to a system of measurement used within the industry to measure type size, one point being equal to .01384 of an inch or approximately Vn thereof. The term "pica” is used to denote ?^2, or % of an inch.
Read literally, the provision from a nonprinter’s view would appear to require that a measurement of the printed impres *809 sion be made to determine if the letters measured lVi2 or Ve of an inch. A number of courts have come to just that conclusion and invalidated the notice of cancellation which, because the wording of the notices involved did not meet the required standard.
It is, however, obvious that the size requirements were not directed to the general public. If such were the case, the Legislature could more easily have provided that the words be-printed in a height measured in inches, or parts thereof (see, e.g., Insurance Law, § 174, subd 1) or set forth an example of the size to be used (see Judiciary Law, § 756) so that a layman could determine if a particular statute had been complied with. It is clear that in using technical terms, the Legislature was addressing itself to the printing industry. It is this group which en masse has apparently misconstrued the section.
As I previously noted, the proceeding before me does not involve an isolated instance of literal noncompliance. The problem is of epidemic proportions. It involves a majority of the carriers writing automobile insurance in this State. In a number of instances, as here, carriers who urge noncompliance by a competitor in one proceeding are unsuccessful respondents in other proceedings where its own notices have been challenged. (See State Farm Ins. Co. v Carrabis, Supreme Ct, Suffolk County, Dec. 20, 1977 [Thom, J.], supra.) Were the "clean hands” doctrine applied or a "practical construction” invoked (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 127) these proceedings would become nonexistent.
To me, this widespread statutory "noncompliance” is incomprehensible, in the face of what a number of courts have found to be a clear, legislative pronouncement, unless there is something in the wording of section 576 of the Banking Law that is misleading the printing trade. That carriers or premium finance companies are seeking to obtain some obscure advantage by reducing the size of the print seems implausible. If such were the case, insurers would have reduced the size of the print to the "eye-defying” levels with which we are all familiar, or omitted the provision altogether, not just utilize the levels they have. I also think it highly unlikely that a wide spectrum of printers who have nothing to gain and much to lose, would knowingly produce a product which did not conform to the requirements, or are so incompetent they are unable to interpret a "crystal clear” statute.
I realize, of course, that using the fact that there has been *810 "noncompliance” to justify an assumption that the statute must be interpreted other than literally has a bootstrap quality to it. However, I am of the opinion that under the realities it is warranted, if not to sanction the conduct, at least insofar as it gives the right to view the statute from a printer’s standpoint to determine if it is susceptible to a reasonable interpretation which would justify their conduct and be in keeping with the intent of the Legislature.
Before discussing the particular statute involved, it should be noted that although it would appear eminently logical that a uniform standardized method of setting forth printing requirements be employed, the Legislature has not seen fit to do so and appears to treat each section on an ad hoc basis. (See, for example, Insurance Law, § 174, subd 1, requiring letters inch high; Insurance Law, § 236, subd 1; § 237, subd 1, requiring type not smaller than 10 points; Insurance Law, § 253, subd 4, giving an example; Insurance Law, § 345, subd 1, requiring type not smaller than 8 point; Insurance Law, § 154, subd 5 requiring capital letters not smaller than 12-point type; Insurance Law, § 164, subd 4, requiring light-face type of a style in general use, the size of which shall be uniform and not less than 10 point; Banking Law, § 567, subd 1, requiring at least 8-point type; Banking Law, § 567, subd 2, requiring 8-point bold type; and Insurance Law, § 368, subd 1, which uses language similar to that at issue.)
While it is possible that the various Legislatures when enacting sections considered from a printer’s standpoint each of the available options, I find it highly probable that their primary concern lay with the contents of the information to be conveyed, and not the method of its conveyance other than to insure it would not be buried amid a myriad of other information. In other words, I will not impute to the Legislature infallability in matters of printing.
As previously noted, the section in question (Banking Law, § 576, subd 1, par [c]) here mandates that the notice with respect to "financial security” be "in type or print of which its face shall not be smaller than twelve point.” (The term print may be disregarded for our purpose, since it is defined as "the impression made by inked type” and would appear to be redundant in light of the definition of face as "the printing of a letter or plate” and in light of fact the section should be read in pari materia with Vehicle and Traffic Law, § 313 [see Pitts v Travelers Ins. Co., 59 Misc 2d 142], which omits the *811 word.) As can be seen, the section does not require capital or block letters be used, nor does it set forth how the 12-point measurement is to be made. It is also significant, for reasons I trust will become apparent, that the singular and not the plural is used in connection with the terms "face”, and "point.”
As mentioned, a number of courts have concluded that in order to determine whether or not a particular notice complies, the letters making up the individual words must be measured to determine if they consist of the required number of points. In my opinion, no such measurement is required.
It is apparent to me that in using the term 12 point in connection with the face of type, the Legislature has been guilty of mixing the proverbial apples and oranges. By definition, custom and usage within the industry, points are used to measure and describe type sizes. To a layman, this distinction is of little import; to a printer, however, it is critical and goes to the very heart of what is intended. This is particularly true in the case of a commercial printer who deals mainly with standardized styles, i.e., design of the full range of characters used, such as Baskerville, Bodoni, Garamound and Times Roman.
The "point” system was adopted in this country in 1886 by the Type Founders Association of the United States as the standard for the measurement of type sizes. It was an attempt by the industry to put an end to a practice in existence from the 16th century of giving various type sizes names such as Pearl, Agate, Nonpareil and Pica. As with all such standards, it was adopted to provide consistency and uniformity within a particular industry. Obviously, a system whose basic unit of measurement is 0.01384 of an inch is intended to serve a specialized purpose and is not a system geared to general usage or susceptible to transposition. Its purpose when adopted and its function today was and is to measure type size, not the face of type.
Type sizes used in this country are multiples of the basic unit, measured through the body lengthwise of the letters (see McGraw-Hill, Encyclopedia of Science and Technology, Type). The type sizes in common usage run from 6 points to 24 points, the larger the size the bigger the print. Significantly, in the industry type is described as its point equivalent, i.e., "8-point type”, "10-point type”, "12-point type”, etc.
The system is such that the particular size of type used to *812 print any given specimen of printed material can be readily and easily obtained without resort to measurement of the actual type bodies used. The number of printed lines within a one-inch vertical space are counted and divided into 72. If 12 lines are counted, the type size would be "6-point”, if 6, as here, "12-point” type was used. In fact, the measuring device used by petitioner’s expert worked on exactly that principle. It was not a device for measuring the face of type.
It is obvious that when the term "12 point” is used, a printer assumes that the size of type is involved.
I would note that the two cases decided in this department dealing directly with this specific problem are apparently concerned with type size and not face size. In Courtney v Hults (18 AD2d 1091), the court found that the use of "10-point type” was proper despite the fact that the statute (Vehicle and Traffic Law, § 313) required 12-point type. In Matter of Lion Ins. Co. (NYLJ, March 29, 1978, p 13, col 3), the court held that the use of "5-½-point type” was inadequate. If these cases stand for the proposition that type size is controlling, this matter could have been disposed of in a few lines, and the foregoing discussion and holdings have then been an exercise in futility. In reaching this determination, however, I have followed the lead of my colleagues and viewed this matter as one involving the issue of the size of the type face used.
That the point system cannot be used as a meaningful or workable standard of measurement for the face of type is clear for one obvious reason. Letters and characters come in all sizes and shapes. There are ascending letters such as "t” and "1” and descending letters such as "y” and "g”. Measurements, in order to be meaningful, would require that a minimum of two characters be used. While such measurement is not impossible, the minimum nature of the unit and the sizes involved, particularly in the lower point types make such measurement impractical. It is true that as far as capital letters are concerned, measurements can be made in terms of points without particular difficulty. However, that is because their uniform nature permits such measurement. That is not to say, however, that "points” are used as the unit of their measurement.
There is, however, a far more significant reason why points are not used in connection with the face of type. The standardization of type size and the uniform nature of the charac *813 ters within a particular style of type make such measurements unnecessary. A type style is designed to produce a maximum esthetic effect. Designers of type consider themselves as the descendants of the producers of the Book of Kells, and take great pains to insure that the characters used and their relationship to each other form the most pleasing whole, and provide for ease of reading. It is the designers of type who are concerned with the size of characters, not printers. Since commercial printers on the whole draw from a limited number of standard type styles, there would be no reason for them to be unduly concerned with such measurement.
The industry itself has, by the adoption of the point system, and its traditional practices, set the minimum and maximum limitations of print size within any particular type size. By adopting standard type sizes, a maximum range has been created because of the requirement that there be at least some space between the various lines. In other words, it would be impossible to have 12-point face on 12-point type. If such were the case, there would be little, if any demarcation between succeeding lines and reading would be extremely difficult. The minimum face size is set by common sense and custom in the industry. While anything is possible, even repeal of the income tax, some things are highly improbable. While a printer could put a face normally found on much smaller type on 12-point type, and by definition claim it was printed in 12-point type, no one in the industry would consider it that way, and would probably dismiss such a claim as another one of those "darn fool lawyers’ tricks.” As indicated in University of Chicago Press, a Manual of Style, "All different styles of 12 point faces for instance, are approximately the same size, but there is considerable variation. The designation 12 point, as referring to a particular typeface means that it is ordinarily cast on a 12-point body.”
Exhibit "K” indicates just such a variation in size within the 12-point type category.
Before leaving the question of points, I would make reference to something that I do not consider evidence, but that I have noticed at the trial of this proceeding, and similar ones. The experts who have testified before me when discussing the size of individual letters invariably use the plural, "points.” "It measures 10 points.” "It does not measure 12 points,” etc. They use the singular when referring to type size, "12 point *814 type”, "10 point type”, etc. The statute as noted uses the singular.
Based upon the foregoing, I can only conclude that the Legislature in enacting section 313 of the Vehicle and Traffic Law and section 576 of the Banking Law, intended that the notice with respect to maintaining "financial security” was required to be printed in "12-point type” with a face no smaller than that customarily used in connection therewith. To find otherwise, is to assume that the Legislature in enacting these statutes intended to create a form of measurement that is not only impractical, but of no importance to the printing industry.
On the facts before me, I find that the notice of cancellation dated January 5, 1976, sent by Kings Premium Service Corporation canceling the policy of insurance issued to Bruce Shilstone by Commercial Union Assurance Companies effective January 20, 1976 was printed in 12-point type and that the type face used in the notice represents a size of face customarily used within the printing industry in connection with 12-point type. Accordingly, I find the notice of cancellation conformed to the requirements of section 576 of the Banking Law.
Petitioner having failed to establish that the Shilstone vehicle was insured on July 12, 1976, it is not entitled to a stay of the demanded arbitration, and the parties are directed to proceed thereto.
In reaching my determination in this matter, I have found it unnecessary to consider petitioner Travelers’ right to challenge the validity of Commercial Union’s disclaimer prior to its being obligated to pay under the uninsured motorists provisions of its policy with Kammer. While there is no question that a strong public policy exists in favor of coverage which mandates strict compliance with the policy provisions and legislative mandates in order to effectuate cancellation (see Messing v Nationwide Mut. Ins. Co., 42 AD2d 1030; GEICO v Mizell, 36 AD2d 452), I question whether such a policy should be extended to instances where a purely technical noncompliance by one carrier is being used as the basis for permitting another carrier to avoid liability on a policy bought and paid for by its insured. To my mind, the right to challenge the validity of a disclaimer should lie with the parties interested in the contract itself, the injured party and the insured. Where, as here, those parties have seen fit not to *815 raise a question with respect thereto, it should seem that the courts are using a strong public policy in favor of insurance to permit an avoidance of coverage.